**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SIESTA HOLDINGS, LLC, *et al.*,** | : | |
| | : | **Case No. 2:25-cv-719** |
| **Plaintiffs,** | : | |
| | : | **Judge Algenon L. Marbley** |
| **v.** | : | |
| | : | **Magistrate Judge S. Courter M. Shimeall** |
| **QHM HOLDINGS, INC., *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

**OPINION AND ORDER**

Plaintiffs Siesta Holdings, LLC ("Siesta") and Alan Rudy bring this action against Defendants QHM Holdings, Inc. ("QHM"), formerly known as PHM Logistics Corporation, and Quipt Home Medical Inc. ("Quipt"). Plaintiffs allege that QHM failed to honor its obligations under a Membership Interest Purchase Agreement (the "Agreement") through which it acquired Good Night Medical, LLC from Siesta and its fellow members, that QHM fraudulently induced them to enter the Agreement, and that Defendants then repudiated a settlement of those disputes reached by email.

This matter comes before this Court on Defendants' Motion to Stay Litigation Pending Arbitration (ECF No. 23) and Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 30). For the following reasons, the Motion to Stay is **GRANTED** and the Motion to Dismiss is **DENIED as moot**.

## I. BACKGROUND

### A. Factual Background

Good Night Medical, LLC is an Ohio limited liability company that provides durable medical respiratory equipment, including nebulizers, oxygen concentrators, and CPAP and BiPAP

units. (ECF No. 27 ¶ 10).[1] Effective April 1, 2022, Siesta, Rudy, and Good Night Medical's other members sold all of the company's membership interests to PHM Logistics Corporation, now QHM, under the Membership Interest Purchase Agreement. (*Id.* ¶¶ 11–12; ECF No. 1-1 at 1). Rudy is a party to the Agreement in his individual capacity, on behalf of Good Night Medical, and as the "Members' Representative," and Siesta is a party as a member. (ECF Nos. 1-1 at 1; 27 ¶ 13). Quipt did not sign the Agreement; Plaintiffs allege that Quipt owns QHM through wholly owned subsidiaries. (ECF No. 27 ¶ 7).

The Agreement is governed by Kentucky law, "and in accordance with federal law interpreting the Federal Arbitration Act where applicable." (ECF No. 1-1 § 10.2). It contains an integration clause providing that the Agreement "wholly cancels, terminates and supersedes any and all previous and/or contemporaneous oral agreements, negotiations, commitments and writings of the parties with respect to such subject matter," (*id.* § 10.5), and a post-closing reconciliation process under which the Members could object to the buyer's Closing Date Statement and submit unresolved objections to a "Settlement Accountant," (*id.* § 1.6).

Section 10.11 of the Agreement, titled "Disputes," then provides:

> All disputes which in any manner arise out of or relate to this Agreement or the subject matter thereof (but not including disputes under employment agreements, which shall be governed by the provisions of such agreements) shall be resolved exclusively by arbitration in accordance with the provisions of this Section.

(*Id.* § 10.11(a)). The remainder of Section 10.11 calls for a single arbitrator, selected from the panel of the American Arbitration Association if the parties cannot agree, who has a background

[1] The Amended Complaint (ECF No. 27) is the operative pleading. It incorporates by reference the exhibits attached to the original Complaint, (ECF No. 27 ¶ 12 n.1), which this Court cites by their docket numbers: the Agreement (ECF No. 1-1), the March 7, 2022 email (ECF No. 1-2), the Consulting Agreement (ECF No. 1-3), and the settlement correspondence, term sheet, and related emails (ECF Nos. 1-4 through 1-7).

in mergers and acquisitions, corporate, and health care regulatory law; for arbitration in Cincinnati, Ohio; for the application of Kentucky substantive law; and for a final and binding award that "shall constitute the only method of resolving disputes or matters subject to arbitration pursuant to this Agreement." (*Id.* § 10.11(b)–(f)). The parties reserved only the right to seek a temporary restraining order, a preliminary injunction, "or other similar short term equitable relief" from a court. (*Id.* § 10.11(g)).

Plaintiffs allege that QHM has "shorted Siesta at every turn" since closing. (ECF No. 27 ¶ 1). According to the Amended Complaint, QHM induced Plaintiffs to accept part of the purchase price in the form of an "NOL Credit," equal to eighty percent of the tax savings that QHM realized from the net operating losses held by Good Night Medical's subsidiary, Metro-Med, Inc., and then declined to use those losses, paying Siesta $8,000 rather than the $1.6 million that Plaintiffs anticipated. (*Id.* ¶¶ 16–32). Plaintiffs further allege that QHM refused to pay for residual CPAP machine inventory at the seventy-five percent valuation that Rudy and QHM's chief financial officer had agreed upon by email before closing, (*id.* ¶¶ 33–43); that QHM failed to remit $19,000 in insurance proceeds and a $49,305.45 Employee Retention Credit refund, (*id.* ¶¶ 44–45, 94–99); that QHM substituted a six-month renewable consulting agreement for the five-year, $500,000 consulting agreement that it had promised Rudy during negotiations, (*id.* ¶¶ 46–58); and that the Chief Financial Officer manipulated Good Night Medical's accounts receivable reporting and obstructed the post-closing reconciliation process in order to reduce QHM's payment obligations (*id.* ¶¶ 59–78).

After nearly two years of discussions, Plaintiff sent Defendants a final demand letter on January 30, 2025. (*Id.* ¶¶ 79–81; ECF No. 1-4 at 9). On February 13, 2025, Defendants responded that Quipt was willing to transfer Metro-Med back to Good Night Medical in exchange for a release

of the NOL claims and an indemnity, adding that "[t]his proposal is subject to the parties agreeing to and executing a fully integrated settlement agreement." (ECF Nos. 27 ¶ 83; 1-4 at 8). Plaintiffs countered with four terms, and on February 27, 2025, Defendants replied that Quipt was "willing to proceed with nos. 1 and 2 (though this is subject to all parties reaching agreement on the necessary documents) but only if it fully and finally resolves the dispute." (ECF Nos. 27 ¶¶ 84–85; 1-4 at 6–7). Plaintiffs accepted that proposal on March 4, 2025. (ECF Nos. 27 ¶ 87; 1-4 at 5). Defendants later disputed that any settlement had been reached, circulated a term sheet that Plaintiffs contend added new material terms, and conditioned further work on the transaction documents on Plaintiffs' agreement that no settlement existed. (ECF No. 27 ¶¶ 88–93). Plaintiffs allege that the parties' emails formed an enforceable settlement under which Defendants agreed to transfer Metro-Med to Plaintiffs and to transfer $19,000 to Rudy "in exchange for a full resolution of the Plaintiffs' claims under the MIPA [Membership Interest Purchase Agreement] and mutual releases." (*Id.* ¶ 104(a)).

### B. Procedural Background

Plaintiffs filed this diversity action on June 27, 2025. (ECF No. 1). On August 11, 2025, Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 8). The first footnote of that motion stated that, "[p]ursuant to Section 10.11 of the Agreement, all disputes 'which in any manner arise out of or relate to this Agreement or the subject matter thereof' are to be resolved 'exclusively by arbitration,'" "Plaintiffs should dismiss this litigation and initiate arbitration," and "[i]f Plaintiffs fail to do so, Quipt reserves the right to seek a stay of this litigation and compel arbitration consistent with the Agreement." (*Id.* at 2 n.1). The body of the motion argued that the Agreement's integration clause and post-closing reconciliation process

defeated Plaintiffs' claims, and its conclusion asked this Court to dismiss the Complaint with prejudice. (*Id.* at 2, 11–14, 21).

In response to the motion, Plaintiffs moved for leave to file an Amended Complaint, contending that the amendment would cure the deficiencies previously identified by the Defendants. (ECF No. 17; *see* ECF No. 30 at 2). While that motion was pending, Defendants filed their Motion to Stay Litigation Pending Arbitration. (ECF No. 23 at 3 (citing ECF No. 12)). The Motion to Stay argues that every claim in the Complaint, and in the proposed Amended Complaint, arises out of or relates to the Agreement and must be arbitrated under Section 10.11. It asks this Court to stay this action under Section 3 of the Federal Arbitration Act. (*Id.* at 1, 4–7).

The Court granted Plaintiffs leave to amend on October 7, 2025. (ECF No. 26).[2] The Amended Complaint consists of six counts: (1) a claim for a declaratory judgment that the parties reached an enforceable settlement agreement and that Defendants must perform it; (2) breach of the Agreement based on the residual machine inventory and the insurance proceeds; (3) breach of the implied covenant of good faith and fair dealing; (4) fraudulent inducement; (5) fraud in the calculation of amounts owed under the Agreement; and (6) breach of the Agreement based on the Employee Retention Credit refund. (*Id.* ¶¶ 100–150). Count One is asserted against both Defendants; Counts Two through Six are asserted against QHM alone. (*Id.*).

On October 21, 2025, Defendants moved to dismiss the Amended Complaint, again seeking dismissal with prejudice. (ECF No. 30 at 20). Plaintiffs opposed, contending in the introduction to their memorandum that Defendants had "waived arbitration because they moved to dismiss with prejudice, asking this Court to take jurisdiction and rule upon the merits, instead

[2] This mooted the first Motion to Dismiss. (ECF No. 39) (citing *Green v. Mason*, 504 F. Supp. 3d 813, 826 (S.D. Ohio 2020)).

of reserving that power for an arbitrator." (ECF No. 35 at 1). Defendants' reply reiterated that the parties "are required [to] submit any disputes that arise out of or are related to the Agreement to arbitration." (ECF No. 38 at 4; *see also id.* at 7 n.3).

On May 8, 2026, Defendants moved for a protective order staying discovery pending a ruling on the Motion to Stay, contending that proceeding with discovery would undermine the purposes of the arbitration provision and could later be characterized as a waiver of their right to arbitrate. (ECF No. 47; *see* ECF No. 52 at 1–2). Plaintiffs opposed, arguing that Defendants had "waived [their] right[s] to arbitration and invited discovery on the merits when [they] attacked [Plaintiff's] claims on the merits." (ECF No. 49 at 3). The Magistrate Judge granted the protective order, stayed all discovery pending resolution of the Motion to Stay, and vacated the case schedule. (ECF No. 52 at 5). Thus, no discovery has taken place. The Motion to Stay and the Motion to Dismiss are ripe for review. This Court first considers whether the action should be stayed in favor of arbitration, finds that issue dispositive, and does not reach the merits of the Motion to Dismiss.

## II. STANDARD OF REVIEW – FEDERAL ARBITRATION ACT

Under the Federal Arbitration Act, a written agreement to arbitrate a controversy arising out of a contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When a suit is brought "upon any issue referable to arbitration under an agreement in writing for such arbitration," the court "*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added). A party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate" to petition for an order compelling arbitration, and the court, "upon being satisfied that the making

of the agreement for arbitration or the failure to comply therewith is not in issue . . . *shall* make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4 (emphasis added).

In ruling on a motion to stay or to compel arbitration, this Court must determine: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, of the claims are arbitrable, whether to stay the remainder of the proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). The party opposing arbitration must "show a genuine issue of material fact as to the validity of the agreement to arbitrate," a showing which "mirrors that required to withstand summary judgment in a civil suit." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). Whether a valid agreement to arbitrate exists is a question of state contract law, *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007), while "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). When a district court finds that a suit involves an arbitrable dispute and a party requests a stay pending arbitration, 9 U.S.C. § 3 "compels the court to stay the proceeding" rather than dismiss it. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

## III. LAW & ANALYSIS

Litigants may seek both a stay under 9 U.S.C. § 3 and an order compelling arbitration under 9 U.S.C. § 4, and the same procedural rules, including the § 3 default limitation, apply under either provision. *Kloosterman v. Metro. Hosp.*, 153 F.4th 501, 505, 507 (6th Cir. 2025) (citing *Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 836–37 (6th Cir. 2021)). These provisions reflect "the fundamental principle that arbitration is a matter of contract," and they place arbitration

agreements "on an equal footing with other contracts" that courts must enforce according to their terms. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). The Act "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). Since arbitration is a matter of contract, however, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation and internal quotation marks omitted).

Defendants' Motion to Stay presents two questions. The first is whether Defendants, by twice moving to dismiss Plaintiffs' pleadings on the merits, have placed themselves "in default in proceeding with" arbitration such that Section 3 no longer entitles them to a stay. 9 U.S.C. § 3. The second is whether Plaintiffs' claims fall within the scope of Section 10.11 of the Agreement. This Court addresses each question in turn, before considering the effect of a stay on Defendants' pending Motion to Dismiss.

**A. Default Under Section 3 of the Federal Arbitration Act**

***1. The Parties' Arguments***

Plaintiffs contend that Defendants waived any right to arbitrate by moving to dismiss the Complaint and the Amended Complaint with prejudice, thereby "asking this Court to take jurisdiction and rule upon the merits, instead of reserving that power for an arbitrator." (ECF No. 35 at 1; *see* ECF No. 52 at 5 (quoting ECF No. 49)). Defendants responded that they identified the arbitration provision in the opening pages of their first filing in this case, that they moved to stay the action before this Court had issued any ruling, and that they have since sought to preserve their right to arbitrate by obtaining a stay of discovery. (ECF Nos. 23 at 2–3; 52 at 1–2).

### *2. Governing Law*

Section 3 conditions a stay on the applicant "not [being] in default in proceeding with such arbitration." 9 U.S.C. § 3. The Sixth Circuit recently explained that the word "default" carries its ordinary legal meaning: a party is in default of a duty or promise "if the party omits or fails 'to fulfill [the] duty' or 'promise' through 'neglect' or otherwise." *Kloosterman*, 153 F.4th at 506 (quoting Black's Law Dictionary 342 (2d ed. 1910)). Thus, "[i]f a defendant litigates in court for a long enough time before seeking arbitration, one would naturally say that the defendant has not lived up to the 'promise' to arbitrate." *Id.*

For some time, the Sixth Circuit evaluated whether a party's litigation conduct extinguished its right to arbitrate under a two-part test, asking whether the party: (1) took "actions that are completely inconsistent with any reliance on an arbitration agreement"; and (2) delayed its assertion of the right "to such an extent that the opposing party incurs actual prejudice." *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713, 717 (6th Cir. 2012) (quoting *Hurley v. Deutsche Bank Tr. Co. Ams.*, 610 F.3d 334, 338 (6th Cir. 2010)); *Solo v. United Parcel Serv. Co.*, 947 F.3d 968, 975 (6th Cir. 2020). After the Supreme Court held that federal courts may not condition a finding of waiver on a showing of prejudice, *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417–19 (2022), the Sixth Circuit "recognized that *Morgan* jettisoned the 'prejudice' element" of that test. *Kloosterman*, 153 F.4th at 506 (citing *Schwebke v. United Wholesale Mortg. LLC*, 96 F.4th 971, 974 (6th Cir. 2024)). What remains is the first element: a party is in default under Section 3 if its litigation conduct was "completely inconsistent with any reliance on an arbitration agreement." *Id.* (quoting *Solo*, 947 F.3d at 975). That question turns "on the totality of the

circumstances" rather than on any "bright-line rule." *Id.* at 509 (quoting *Schwebke*, 96 F.4th at 976).[3]

The Sixth Circuit's cases identify one course of conduct as inconsistent with arbitration: "if the defendant first seeks 'an immediate and total victory' in court through a motion to dismiss under Rule 12(b)(6) and then moves to arbitrate only after the court rejects this initial attempt to end the dispute." *Id.* at 508 (quoting *Solo*, 947 F.3d at 975). A defendant who proceeds in that manner is in default "because the party has failed to 'observe'—indeed, has affirmatively disavowed—the 'promise' to arbitrate the merits." *Id.* Defendants "may not 'play heads I win, tails you lose' by keeping arbitration in reserve just in case a court does not reject the entire case at the start." *Id.* (quoting *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995)). At the same time, the Sixth Circuit has been careful to distinguish that course of conduct from the mere filing of a motion to dismiss. A party "does not necessarily lose the right to arbitrate one claim merely by moving to dismiss a different claim," and a motion seeking dismissal on jurisdictional grounds "does not choose a court over an arbitrator 'for a decision that resolves the dispute.'" *Id.* at 510 (quoting *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prods., Inc.*, 660 F.3d 988, 995 (7th Cir. 2011)); *see Solo*, 947 F.3d at 975.

### *3. Analysis*

Taken as a whole, Defendants' conduct in this litigation has not been completely inconsistent with reliance on Section 10.11 of the Agreement. There are four reasons why. First, Defendants invoked the arbitration provision at the outset. Their first filing in this case, the August

[3] The *Kloosterman* majority found it unnecessary to decide whether the Section 3 inquiry is best described as one of waiver, forfeiture, or default, 153 F.4th at 506–07, a question that the two concurring opinions examined at length, *see id.* at 511–15 (Murphy, J., concurring); *id.* at 515–17 (Bloomekatz, J., concurring).

2025 Motion to Dismiss, quoted Section 10.11, asserted that all disputes arising out of or relating to the Agreement "are to be resolved 'exclusively by arbitration,'" told Plaintiffs that they "should dismiss this litigation and initiate arbitration," and reserved the right "to seek a stay of this litigation and compel arbitration consistent with the Agreement" if Plaintiffs declined to do so. (ECF No. 8 at 2 n.1). This is the opposite of the conduct at issue in *Kloosterman*, where the defendants twice sought a merits dismissal "[b]efore the Hospital gave the slightest hint that it might invoke arbitration." 153 F.4th at 508. Plaintiffs were on notice from the first month of motions that Defendants regarded this dispute as one for an arbitrator.

Second, Defendants moved to stay this action before this Court had ruled on any issue. (*See* ECF No. 23). At that point, this Court had not ruled on the first Motion to Dismiss, and Plaintiffs had sought leave to amend. (ECF No. 17). Defendants therefore had no "preview of how the merits might progress in court" when they asked to arbitrate. *Kloosterman*, 153 F.4th at 503. The timing of the request for arbitration relative to the court's treatment of the merits is central to whether a party seeking arbitration has acted inconsistently with that request. In *Kloosterman*, the defendants "repeatedly asked the district court to dismiss all of Kloosterman's claims on the merits," the court "declined to dismiss several of them," and "[o]nly at that point—after a year of litigation and after the defendants got a preview of how the merits might progress in court—did they seek to arbitrate." *Id.* The *Kloosterman* district court issued "a 43-page opinion granting the motion to dismiss in part and denying it in part" before the defendants raised arbitration "for the first time," "over a year after Kloosterman sued." *Id.* at 504–05. Only after the defendants "got a sneak peak [*sic*] of how the case would proceed if it remained in court" did they "shift to wanting to take [their] chances with arbitrators." *Id.* at 508. The same sequence marked the decisions on which *Kloosterman* relied. *See id.* at 508 (collecting cases in which

defendants sought arbitration only after losing, in whole or in part, their motions to dismiss or for summary judgment); *Solo*, 947 F.3d at 975–77 (finding waiver where the defendant sought to enforce its arbitration rights only after the court of appeals had rejected its merits arguments and after further discovery on remand). The facts are dissimilar here, where the first Motion to Dismiss was mooted by the Amended Complaint and was never addressed on the merits, (ECF No. 39), and the second Motion to Dismiss remains pending.

Third, Defendants have not litigated the merits of this dispute in any other respect. They did not initiate this suit, remove it, or answer it. They have taken no discovery, and when discovery deadlines loomed under the case schedule while the Motion to Stay remained pending, they sought and obtained a protective order on the express ground that participating in discovery could later be characterized as a waiver of their right to arbitrate. (ECF No. 52 at 1–2, 5). Their actions reflect an effort to *preserve* an arbitration forum, and they stand in contrast to the conduct that courts find override the right to arbitrate. For example, the defendant in *Schwebke* answered without pleading arbitration and then engaged in a half a year of extensive discovery, including document productions, third-party subpoenas, and depositions, before moving to compel. 96 F.4th at 973–74. The defendant in *Johnson Associates* likewise answered without asserting arbitration and litigated for eight months, participating in scheduling, discovery, and settlement negotiations, before seeking to arbitrate. 680 F.3d at 715–19. In *Cabinetree*, the defendant removed the action to federal court, participated in discovery in which nearly two thousand documents were produced, allowed a trial date to be set, and moved for a stay only after eight months in federal court, with no explanation for the delay other than a desire to weigh its options. 50 F.3d at 389–91. Even in *Kloosterman*, the defendants' participation in discovery planning "further bolster[ed]" the

conclusion that they were in default. 153 F.4th at 509. By contrast, Defendants have taken none of these steps here.

Fourth, and most significantly, the sequence of events in this case satisfies only half of the test that *Kloosterman* and *Solo* apply to merits motions. To be sure, Defendants' pending Motion to Dismiss seeks "'an immediate and total victory' in court through a motion to dismiss under Rule 12(b)(6)," *Kloosterman*, 153 F.4th at 508 (quoting *Solo*, 947 F.3d at 975), and both of Defendants' motions requested dismissal with prejudice, (ECF Nos. 8 at 21; 30 at 20), a form of relief that, if granted, would end the dispute in every forum. *See Kloosterman*, 153 F.4th at 508. A request of that kind sits in tension with an invocation of arbitration. Under the Sixth Circuit's formulation, such a request becomes "entirely inconsistent" with arbitration when the defendant "moves to arbitrate only after the court rejects this initial attempt to end the dispute." *Id.* Defendants did not wait for a rejection: they asked for arbitration in the same filing that first sought dismissal, they moved for a stay before any ruling issued, and they filed their second merits motion three weeks after the Motion to Stay was already pending. Taken together, Defendants' submissions presented this Court with a request that the dispute be sent to arbitration but preserved their defenses on the merits. A party that asks for arbitration first, and preserves its merits defenses in the event arbitration is denied, has not chosen "a court over an arbitrator 'for a decision that resolves the dispute.'" *Id.* at 510 (quoting *Kawasaki Heavy Indus.*, 660 F.3d at 995). Because this Court did not reject (or address) the merits-arguments seeking to end the dispute, and because every other circumstance of this litigation reflects continued reliance on Section 10.11, this Court cannot say that Defendants' conduct was "completely inconsistent with any reliance on an arbitration agreement." *Id.* at 506 (quoting *Solo*, 947 F.3d at 975).

The Sixth Circuit expressly acknowledged that other courts have "refused to find a defendant in default of arbitration merely because it filed a motion to dismiss," and it distinguished those decisions on their facts rather than categorically rejecting them. 153 F.4th at 510. The rule that emerges from *Kloosterman* and *Solo* is directed at a particular strategy: using the court to test the merits and turning to arbitration only when that test fails. *See id.* at 508 ("[I]f the defendant wins this motion, it will forgo arbitration altogether."); *Cabinetree*, 50 F.3d at 391 ("Kraftmaid wanted to see how the case was going in federal district court before deciding whether it would be better off there or in arbitration."). Defendants have not pursued that strategy, and the request for dismissal with prejudice in the first Motion to Dismiss does not stand alone; it appeared in a filing that, in the same breath, told Plaintiffs to dismiss the case and initiate arbitration. (ECF No. 8 at 2 n.1). That position is not inconsistent with reliance on the arbitration agreement, even if the relief requested in the motion's conclusion was broader than the arbitration provision would have permitted this Court to award. On the totality of these circumstances, Defendants are not "in default in proceeding with" arbitration, and Section 3 requires this Court to consider whether the dispute is referable to arbitration under the Agreement. 9 U.S.C. § 3.

## B. The Scope of the Arbitration Agreement

### *1. The Parties' Arguments*

Defendants contend that Section 10.11(a) is a broad arbitration clause, that Counts Two through Six each depend on the Agreement, and that Count One, which seeks to enforce a settlement of "Plaintiffs' claims under the MIPA [Membership Interest Purchase Agreement]," arises out of and relates to the Agreement as well. (ECF No. 23 at 4–7). Plaintiffs do not dispute that they are parties to the Agreement or that Section 10.11 is a valid arbitration provision. Yet

they characterize the settlement as "an independent agreement" governed by Ohio law rather than by the Agreement's choice-of-law provision. (ECF No. 35 at 6 n.2).

### *2. Governing Law*

Whether a dispute falls within an arbitration clause begins with the language of the clause, read "in light of the strong federal policy in favor of arbitration." *Stout*, 228 F.3d at 714. A clause that reaches all disputes "arising out of" or "relating to" a contract is treated broadly. *See Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504–05 (6th Cir. 2007); *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 813–14 (6th Cir. 2008). Where the clause is broad, "only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators." *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 577 (6th Cir. 2003) (quoting *AT&T Techs.*, 475 U.S. at 650). A dispute must be sent to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Huffman*, 747 F.3d at 395 (quoting *AT&T Techs.*, 475 U.S. at 650). In applying these principles, courts in this circuit ask whether "an action could be maintained without reference to the contract or relationship at issue. If it could, it is likely outside the scope of the arbitration agreement." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003); *see NCR Corp.*, 512 F.3d at 814. Tort claims are no exception: "[e]ven real torts can be covered by arbitration clauses . . . if the allegations underlying the claims touch matters covered by the" agreement. *Fazio*, 340 F.3d at 395 (citation and internal quotation marks omitted).

### *3. Analysis*

The threshold requirements are satisfied: Siesta and Rudy are parties to the Agreement, (ECF No. 1-1 at 1), Section 10.11(a) is a written agreement to arbitrate, and Plaintiffs have not

identified any ground, under Kentucky law or otherwise, on which the provision would be invalid. *See Great Earth*, 288 F.3d at 889. No federal statutory claim is asserted, so the remaining question is the scope of Section 10.11.

*a. Counts Two Through Six*

Section 10.11(a) reaches "[a]ll disputes which in any manner arise out of or relate to this Agreement or the subject matter thereof." (ECF No. 1-1 § 10.11(a)). The provision is broad in every respect: it reaches disputes that merely "relate to" the Agreement, it does so whenever the relationship exists "in any manner," and it extends beyond the Agreement itself to "the subject matter thereof," that is, the sale of Good Night Medical. Its only exclusion is for "disputes under employment agreements." (*Id.*).

Counts Two through Six fall comfortably within that language. Count Two alleges that "Siesta and QHM are parties to the Agreement" and that QHM breached the Agreement by failing to pay for the residual machine inventory and the insurance proceeds. (ECF No. 27 ¶¶ 107–116). Count Three alleges that QHM breached the covenant of good faith and fair dealing that Kentucky law implies "within every contract" by obstructing performance of the Agreement and by declining to use the net operating losses that Section 1.7 addresses. (*Id.* ¶¶ 118–127). Count Four alleges that QHM made false promises "[t]o induce Siesta to enter into the Agreement." (*Id.* ¶ 129). Count Five alleges that Mehta's representations about the accounts receivable calculations "were material to carrying out the Agreement" and that Siesta relied on them "in carrying out the Agreement." (*Id.* ¶¶ 140, 145). Count Six alleges "a distinct breach of the Agreement" arising from QHM's refusal to transfer the Employee Retention Credit refund that Schedule 1.5(b) of the Agreement allegedly requires it to pay. (*Id.* ¶¶ 97, 149). None of these claims "could be maintained without reference to the contract." *Fazio*, 340 F.3d at 395.

*b. Count One*

Quipt did not sign the Agreement, and Count One is asserted against Quipt as well as QHM. Whether a nonsignatory may enforce an arbitration agreement is a question of state contract law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009). Plaintiffs have not argued that the claim against Quipt should proceed in this Court while the identical claim against QHM proceeds in arbitration, and this Court does not need to resolve whether Kentucky law would permit Quipt to invoke Section 10.11 in its own right. Section 3 requires a stay of "the trial of the action" as to the issues referable to arbitration, 9 U.S.C. § 3, and the claim against Quipt is the same claim that Plaintiffs assert against QHM, resting on the same correspondence, seeking the same declaration, and turning on the same questions about the parties' rights under the Agreement. Even if Quipt could not itself compel arbitration, this Court would exercise its discretion to stay the claim against Quipt pending the arbitration between Plaintiffs and QHM, because proceeding on that claim in this forum would risk inconsistent determinations of the very issues committed to the arbitrator and would serve no purpose that arbitration will not serve. *See Moses H. Cone*, 460 U.S. at 20 n.23 ("In some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket."); *Stout*, 228 F.3d at 714; *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936).

**C. The Stay and the Motion to Dismiss**

Because every claim in the Amended Complaint is referable to arbitration under Section 10.11 of the Agreement and Defendants are not in default, Section 3 requires this Court to stay this action on Defendants' application. 9 U.S.C. § 3; *Smith*, 601 U.S. at 478. Defendants have requested a stay rather than dismissal, (ECF No. 23 at 7), and this Court lacks discretion to dismiss

the action in favor of arbitration in any event. *Smith*, 601 U.S. at 475–78; *Kloosterman*, 153 F.4th at 507. This Court will therefore stay the action and retain jurisdiction over it pending the completion of arbitration.

The stay also disposes of Defendants' Motion to Dismiss, which asks this Court to decide the merits of the very claims that the parties agreed to submit "exclusively" to an arbitrator, including whether the settlement correspondence formed a binding contract, whether the integration clause bars Plaintiffs' reliance on pre-closing communications, whether Plaintiffs forfeited their objections by failing to follow the Section 1.6 reconciliation process, and whether the fraud claims are pleaded with the requisite particularity. (ECF No. 30 at 4–20). Those questions are for the arbitrator, and the Motion to Dismiss is accordingly denied as moot, without prejudice to Defendants' ability to raise its arguments in the arbitration or, should this matter return to this Court, in any subsequent proceeding.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Stay Litigation Pending Arbitration (ECF No. 23) is **GRANTED**, and Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 30) is **DENIED as moot**. This action is **STAYED** pending arbitration of Plaintiffs' claims in accordance with Section 10.11 of the Agreement, and the parties are **DIRECTED** to proceed to arbitration in accordance with that provision. The parties shall file a joint status report within fourteen days of the conclusion of the arbitration, and every ninety days in the interim, advising this Court of the status of the arbitration.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 29, 2026**